Pearsox, J.
 

 It may seem hard that one is not allowed to dispose of his own property as he pleases; but private right must yield to the public good. The policy which forbids emancipation, unless the freed negroes are sent out of the State,
 
 *146
 
 and tbe policy wbieli forbids
 
 quasi
 
 emancipation, by which particular negroes are to be allowed privileges, and are not to be required to work like other negroes, but to some extent are to have a- discretion either to work or
 
 not to
 
 work, as they may feel inclined, is fully settled by the numerous cases which have been before our Court, and is strongly enforced by the Legislature. Rev. Code, ch. 107, sec. 28 : “ No person under any pretence whatever shall hire to his slave, or to a slave under his control, his time, on pain, &c.” “ It shall be the duty of all grand juries to make presentment of any slave who shall be permitted by his master to go at large, having hired his own time, &e.” Sec. 291: “ No slave shall go at large as a free man exercising his own discretion in the employment of his time; nor shall any slave keep house to* him, or herself, as a free person, exercising the like discretion in the employment of his or her time; and in case the owner of the slave shall consent to the same, or connive thereat, he shall be deemed guilty of a misdemeanor.”
 

 In our case had the testator tried
 
 on purpose,
 
 he could not have more directly violated the provisions of this Statute, or more effectually contravened thofixed policy of the State. Here we have a family of negroes with two hundred acres of land, and three thousand dollars in money, to provide for their support,
 
 so that they may not le made to work like other negroes.
 

 But it is said for Mr. Brown, the slave Eanny was near sixty years of age, Milly, forty-live, Mariah and Mary Anne, each, twenly or twenty-five, and the rest small children, and the bequest being to him only for life, during which time tbe}r would probably be a charge, the use of the land and money was not an unreasonable provision. Concede that, if the matter liad stopped here, this provision would not have been much out of the way, how is it to be accounted for, that upon the death or insolvency of Mr. Brown, he is to have a successor, who is to be chosen by Milly, if alive, if she be dead, by Mary Anne, and in case of her death,by Mariah? Such a provision is unusual, and proves that the object was to confer a benefit upon the slaves, and that neither Mr. Brown nor his successor were the
 
 *147
 
 objects of the testator’s bounty, and were but “nominal do-nees.”
 
 Sorry
 
 v. Bright, 1 Dev. and Bat. Eq. 113. Add to this, that the successor so to be chosen is to have the two hundred acres of land, and $3000 in money, for, and in consideration of, his accepting the
 
 absolute ownership
 
 of some ten or a dozen slaves. Under these circumstances, could Mr. Brown, or his successor, with a clear conscience towards the testator, make the negroes work like other negroes do? The thing is too plain for discussion.
 

 The testator betrays a consciousness that his purpose was questionable by denouncing a forfeiture against all who should oppose his wishes. But his was a mistaken charity which the law forbids. The result, if his intentions are to be carried out, will be to establish in our midst a set of privileged negroes, causing the others to be dissatisfied and restless, and affording a harbor for the lazy and evil disposed.
 

 "We had some difficulty as to the construction of the will in regard to “ the dining tables, silver-ware, glass, and carryall, &c.,” given to Mr. Brown. "Were they intended for the use of these negroes, or a beneficial gift to him ? They are put in the same clause with the bequest of the negroes, and the land and money intended for them, and there is a distinct legacy of $500 given to him as a compensation for his trouble, in addition to the commissions allowed by law; but on the other hand, he was an intimate friend of the testator, as appears from several parts of the will. Articles like these are such as one usually leaves to his friend, and are not at all suitable for negroes; besides, they are not made subject to the provision by which to follow them, and do not pass with the land and money to the successor of Mi’. Brown. These considerations satisfy us that the beneficial use was intended for him, and such will be declared to be the opinion of the Court.
 

 The disposition which the testator attempts to make of these slaves, money and land, being void, the question is presented, does the right devolve upon the next of kin and the heirs-at-law, for whom Mr. Brown will be declared a trustee ? or are the lega
 
 *148
 
 tees named, in the 5th item, entitled to the slaves and money, and the devisees named in the 8th item, entitled to the land?
 

 In regard to the land there is no difficulty; for it is a well settled rule that all real estate which is not effectually disposed of by the will, devolves upon the heir-at-law, and a residuary devisee can take nothing except what appears from the will it was intended for him to take. So that, if a devise fails to take effect because it is void, or by reason of the death of the devisee, the subject devolves upon the heir, and the residuary devisee is not entitled to it — there being no reason for substituting a presumed general intention in place of the particular intention which has failed.
 

 But it was insisted that in regard to the personal estate, a different rule is well settled by the courts of England, and has received the sanction of several cases in our own courts, by which the residuary clause is enlarged so as to embrace all property not effectually disposed of, and thereby give to the residuary legatee the benefit of all legacies that failed either by reason of lapse, or of being declared void on the ground of a presumed general intention against intestacy; and it was contended that, according to this rule, the legatees named in the 5th item became entitled to these slaves and the money by force of the 6th item. As the intention of the maker of a will ought to govern its construction, both in respect
 
 to
 
 personal and real estate, it would seem that the same rules of construction ought to be applied without reference to the different kinds of property, and the conclusion that, according to the rules which have been adopted in respect to personal property, these slaves, whom it was specially the intention of the testator to
 
 favor,
 
 are to be sold to the highest bidder, like so many horses and hogs, in pursuance of his
 
 jpresumed general intention,
 
 is so monstrous as to furnish an instance of the
 
 reduotio ad dbsurdvmv.
 
 From these considerations we held the question under an
 
 advisa/ri,
 
 for the purpose of examining the cases and reflecting upon the reason of the thing.
 

 In case of intestacy, the whole personal estate devolves upon the administrator, and by the old law, after paying the funeral
 
 *149
 
 expenses and debts, the administrator kept the surplus for his own use. So, in case of a will, the whole devolved upon the executor, who, after paying the funeral expenses, debts and legacies, kept the surplus for his own use. The law was changed in respect to administrators by the 22, Charles II, (called the statute of distributions), and by it administrators were required to divide out the surplus among the next of kin. But this statute did not apply to executors, and they still kept the surplus for their own use in this State until 1789, when they were required to divide the surplus among the next of kin; Rev. Code, ch. 46, sec. 24. The law remained unchanged in England by any statutory provision until 1832, Will. IY, when executors were required to divide the surplus among the next of kin.
 

 But, in the mean time, the Chancellors in England, upon the idea that it was not just for executors to keep the surplus for their own use, took the matter in hand, and exerted their ingenuity, when there was no residuary clause, to convert executors into trustees for the next of kin whenever it was possible to do so; and where there was a residuary clause they enlarged it so as to include every thing that was not effectually disposed of by the other parts of the will, for the purpose of preventing the executor from keepingit for his own use. This was done upon a principle similar to the doctrine of
 
 cy pres,
 
 according to which, if the particular purpose intended cannot be carried into effect, the fund will be applied to some other purpose as near like it as may be. So, if the particular individual, for whom a legacy was intended, could not take it because of his death in the testator’s life-time, or because the legacy was void, it was held that it should pass to the
 
 next object
 
 of the testator’s bounty and fall into the residuum, upon the presumption that the testator had a general intention to give this additional bounty to the residuary legatee, rather than die intestate in respect thereto, and let it remain in the hands of the executor for his own use. Under the operation of this rule, residuary legacies, which are usually intended to embrace such small matters as may have been forgotten, or were
 
 too tedious
 
 to
 
 *150
 
 mention, oftentimes become an important part of the will and passed the bulk of the estate;
 
 Cambridge
 
 v.
 
 Rous,
 
 8 Ves. 14, is an apt instance. This reasoning may be sound in regard to lapsed legacies, on the ground that the will speaks at the death of the testator, when he may be supposed to have been made aware of the death of the legatee, and for that reason, to have an intention to include the subject of the lapsed legacy in the residuary clause, but it is not sound in regard to legacies declared void ; for at the death of the testator he supposes that he has made an effectual disposition of the subject to one, and cannot be presumed to intend to give it to another.
 

 Rut, our courts having discarded the doctrine of
 
 cypres,
 
 we will not stop to inquire how far every corollary, or emanation from it, is affected. Nor will we stop to inquire how far the act of 1789 renders the rules of construction, adopted in England prior to 1832, inapplicable here ;
 
 (Ralston
 
 v.
 
 Telfair,
 
 2 Dev. Eq. 255, shows that the act of 1789 affects the English rule to some extent, and
 
 Kirkpatrick
 
 v. Rogers, 6 Ire. Eq. 130,
 
 Hudson
 
 v.
 
 Pierce,
 
 8 Ire. Eq. 126,
 
 Pippin
 
 v.
 
 Ellison,
 
 12 Ire. Rep. 61,
 
 Lowe
 
 v.
 
 Carter,
 
 2 Jones’ Eq. 377, all make exceptions to the general rule,) because the doctrine, if it bo unimpaired and of full authority in our courts, has no application to this case; for in the will now under consideration, there is no
 
 general residuary
 
 clause, or as Rufsot, C. J., expresses it in
 
 Sorry
 
 v.
 
 Bright, “
 
 no express general gift of the residue,” which is necessary in order to make the doctrine applicable; and this will has, upon its face, full proof to rebut the presumption of any intention that these slaves and money were to pass under either the 5th or the 6th items.
 

 The testator, having given the slaves in controversy, and the money and land, to Mr. Brown, and made other specific and pecuniary legacies, divides the residue of his estate into four classes, 1st: Ilis slaves; 2nd, his personal estate, that is, such as he intends to be sold, viz: horses, cattle, farming tools, &c.; 3rd, debts due to him, viz: notes, accounts, &c.; 4th, his land.
 

 By the 5 th jtem he gives the
 
 “remainder of my slaves not herein specifically bequeathed,'”
 
 to certain legatees — among whom
 
 *151
 
 lie directs they shall be divided so as not to separate families, and “
 
 in no event to sell them for a
 
 division;” and in providing a subdivision, he again repeats, “ in this division there must be no sale,” &c. This is not a general residuary clause, and the mind rejects at once the suggestion that it was intended to include in it the slaves in controversy. They are as clearly excluded from it as if the testator had specially excepted them by name.
 

 By the 6th item, “I desire that all my personal estate not
 
 hereinbepueathed
 
 be
 
 sold,
 
 and the proceeds, after paying debts and special legacies, to be divided among the same persons
 
 as my slaves
 
 are, as mentioned in the 5th clause.” This is not a general residuary clause. The words “ as my slaves are,” referring to the 5th item, prove that this only includes articles of personal property, other than slaves — such as he intended to be sold; and the fact that he directs these articles of personal property to be sold, demonstrates that it was not his intention to include in it the slaves that he intended to favor more’than his other slaves. In fact it demonstrates his intention to be to
 
 exclude
 
 them. Eor if he is so regardful of his other slaves as to separate them from the rest of his property and put them in a class to themselves so as to have them divided without, being sold, although the same persons are to have them as are to get the proceeds of the sale, much more must it have been far from his intention to class with these articles his favorite slaves. In
 
 Pippin
 
 v.
 
 Ellison,
 
 supra, and
 
 Lowe
 
 v.
 
 Carter,
 
 supra, it is held that a direction
 
 to sell
 
 the residiré excludes from a general residuary clause
 
 dioses in action,
 
 because such things as accounts, debts, &c., are not the subject of sale by executors and administrators. The principle applies here, because the testator expressly declares that even his less favored slaves
 
 are not to be sold.
 

 In the same item he adds, “ I desire all money arising from any source to be divided in the same way,” except the accounts due on his shop-books, which he releases. This exception shows what is meant by “ money arising from any source,” and proves this not to be a general, but a restricted, residuary
 
 *152
 
 clause, having reference only to what was due him on bonds and accounts, (other than shop accounts), but certainly having no reference to the money that might be made by the sale of his favorite negroes ; in the same way that the 8th item, “I desire all my real estate of every kind, whatever it may be, except what is herein specifically bequeathed to Thomas J-Brown, to be equally divided between” certain devisees, cannot, by any effort or ingenuity, be made to embrace the 200 acres devised to Mr. Brown.
 

 The legacy of $3000 is given to Mr. Bro-wn on account of the slaves, to attend them as an incident; it follows that that amount is likewise excepted out of the above items on the ground that the
 
 incident follows the principal.
 
 For as there is a plain intention that the legatees, named in the 5th item, shall not take the negroes, there is the same intention in respect to the money.
 

 There will be a decree declaring that Mr. Brown holds the negroes and money in trust for the next of kin, and the land in trust for the heirs-at-law. .
 

 Per Curiam, Decree accordingly.